Marvin LIVINGSTON, Stanley Walker, through his next friend and mother, Amy Walker, and Edward Powell, as individuals, and as a class for all those similarly situated, Plaintiffs,

v.

Bernard GARMIRE, as Chief of Police of the City of Miami, and William Porter, as Prosecuting Attorney for the Municipal Court of the City of Miami, Defendants.

No. 69–1151–Civ.

United States District Court
S. D. Florida,
Miami Division.

Jan. 16, 1970.

C. Michael Abbott, Miami, Fla., E. O. P. I. Legal Services, for plaintiffs.

Allan H. Rothstein, City Atty., S. R. Sterbenz, Asst. City Atty., Miami, Fla., for defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

EATON, District Judge.

This is a class action brought by the plaintiffs under Rule 23(b) (2), Fed.R. Civ.P. The individual plaintiffs currently face prosecution before the Municipal Court of the City of Miami, Florida. Defendants are Bernard Garmire, the City's Chief of Police, and William Porter, the Prosecuting Attorney for the Municipal Court. The individually named plaintiffs sue as representatives of the class of all black citizens who now or in the future face prosecution in the Municipal Court of the City of Miami for disorderly conduct under subsections (a) and (f) of § 38–10, Miami City Code, commonly known as the "disorderly conduct" ordinance.

The amended complaint alleges that subsections (a) and (f) of the disorder-

ly conduct ordinance are unconstitutional on their face, contrary to the guarantees of the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States. It alleges that subsections (a) and (f) have a "chilling effect upon" and abridge plaintiffs' freedom of speech; deny them their right of privacy; and are palpably vague and overbroad, thus depriving plaintiffs of due process of law, while giving the defendants unbridled discretion to arrest at will whomsoever they please.

Plaintiffs specify in their complaint that in the month of July, 1969, the defendant Garmire, through his agents, made 153 arrests for disorderly conduct and that 82% were under subsections (a) and (f). They say that in August, 138 arrests were made for disorderly conduct, 91% of which were under subsections (a) and (f). In the month in which the three named plaintiffs were arrested and charged under the disorderly conduct ordinance, it is alleged that 69% of the arrests were under subsections (a) and (f).

Despite the prayers in the "wherefore" clause that this Court should enter declaratory judgment declaring the entire disorderly conduct ordinance unconstitutional, or, in the alternative, subsections (a) and (f) of the ordinance unconstitutional, the Court will limit itself to declarations and to injunctive orders having to do with subsections (a) and (f). This is so because no plaintiff has been arrested, nor is prosecution threatened, for conduct or speech violative of any section of the ordinance save subsections (a) and (f), and because it is alleged that enforcement of those two particular subsections discriminates against the class.

This opinion will discuss the unconstitutionality of subsection (a). An opinion to follow within ten days will deal with subsection (f).

Subsection (a) of § 38–10, Miami City Code, reads as follows:

"Any person in the city shall be deemed guilty of disorderly conduct who:

(a) Shall make, aid, countenance or assist in making any improper noise, riot, disturbance, breach of the peace or a diversion tending to a breach of the peace."

This Court has jurisdiction of this cause on the basis of both general federal question jurisdiction, 28 U.S.C. § 1331, and special federal jurisdiction of cases seeking relief for certain specified wrongs, 28 U.S.C. § 1343.

Defendants urge that one of the doctrines of federal abstention is applicable here and should be utilized in order to allow the state courts of Florida to adjudicate the questions presented to this Court. Defendants point out that the individual plaintiffs currently face prosecution in the Municipal Court for violations of the challenged subsections of the ordinance; that the plaintiffs may assert their constitutional attack in the Municipal Court; that a ruling by the Municipal Court would be appealable through the state court system; and that the final state court ruling is subject to review by the Supreme Court of the United States.

On the question of federal forbearance we look to the opinion written by Judge Will for a three judge district court in the case of Landry v. Daley, 280 F.Supp. 938 (N.D.Ill.E.D.1968). Under the general heading "The question of federal forbearance," we find that the language of [1, 2], beginning on page 946 of that case, is applicable here. Therefore, rather than repeat those pertinent observations, we accept them as our own and incorporate them by reference. Moreover, the class alleged by plaintiffs in the instant case includes members who do not now face prosecution. The subsections in dispute are challenged on grounds of overbreadth and vagueness. In Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), the Supreme Court of the United States directed that under such circumstances a federal court has a duty to adjudicate

the federal claims which are before it and to render declaratory relief one way or the other.

In Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the Supreme Court of the United States dispelled any notion that federalism requires automatic deference to state courts. The Court wrote: "[T]he allegations in this complaint depict a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights." There the Supreme Court said that "[A] substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination." The same is true in our case.[1]

▮ In addition to the directives handed down to this Court by the Supreme Court of the United States in *Zwickler* and *Dombrowski,* a study of Florida Court of Appeals decisions and Supreme Court of Florida decisions interpreting statutes and ordinances similar to the subsections before this Court leads us to the conclusion that we should not abstain.

▮ The first step toward the determination of the constitutionality or unconstitutionality of subsection (a) is to determine how the Florida appellate courts have construed ordinances or sections of ordinances which bear close similarity to subsection (a). Those constructions are as binding upon us as though the precise words had been written into the subsection. The interpretations by the state courts of last resort are binding upon questions of state law.

Thirty years ago the Supreme Court of Florida, in State ex rel. Green v. Capehart, 138 Fla. 492, 189 So. 708 (1939), considered the question of the constitutionality of a Hollywood, Florida, ordinance, a portion of which included the exact language of subsection (a) of the Miami ordinance here under attack. Though reversing on other grounds, the Supreme Court of Florida disposed of the constitutional challenge preemptorially with these words: "We think the Ordinance is valid."

In Matteson v. City of Eustis, 140 Fla. 591, 190 So. 558 (1939), that Court, at least by implication, held that a City of Eustis ordinance under which a citizen had been charged with disturbing the peace and quiet of the City of Eustis in that he "did make or cause to be made loud, unusual, and offensive noise and disturbance," was not violative of the Fifth Amendment to the Constitution of the United States.

In the City of St. Petersburg v. Calbeck, 114 So.2d 316 (2 Dist.Fla.App. 1959), the Court quashed the judgment of a Circuit Court which had held unconstitutional an ordinance similar to the ordinance in State ex rel. Green v. Capehart. The Second District Court of Appeal of Florida accepted the following definition of a breach of the peace: "In general terms a breach of the peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence or tending to provoke or excite others to breach the peace, or, as sometimes said, it includes violation of any law enacted to preserve peace and good order."[2]

In that case, the Florida court also accepted a construction of "disorderly con-

1. We agree with Justice Fortas' synopsis of *Dombrowski* rendered in his dissent in Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). *Dombrowski* is strong medicine. However, subsection (a) of the Miami ordinance makes it a violation to make an "improper" noise or disturbance. Subsection (a) reads that one is guilty of disorderly conduct if he breaches the peace or makes a diversion which tends to do

so. The apparent overbreadth of the subsections under attack has led us to reliance upon *Dombrowski.*

2. Compare Florida's definition of "breach of the peace" with Alabama's definition as set out in Wright v. City of Montgomery, 406 F.2d 867 (5th Cir. 1969) where the United States Court of Appeals for the Fifth Circuit upheld the constitutionality of an otherwise broad municipal ordinance.

duct" which read as follows: "The term disorderly conduct has been construed as embracing all such acts and conduct as are of a nature to corrupt the public morals or outrage the sense of public decency, whether committed by words or acts." It gave its blessing to the proposition that the utterance of "abusive or profane language, and loud, disturbing, and obnoxious noises" might be regarded as breach of the peace or disorderly conduct. It agreed with language from McQuillan on Municipal Corporations, 3rd ed. section 24.99, which reads as follows: "It is not possible to define comprehensibly 'disorderly conduct' any more than it is possible to define comprehensibly misdemeanors, nuisances, police power or insulting words; each case turns upon its facts, to be judicially determined."

After further proceedings in the Circuit Court, the Circuit Judge, not to be outdone, again reversed[3] the conviction of the Calbecks, but on different grounds. The Circuit Court held that the conduct of the Calbecks prior to their arrest did not constitute disorderly conduct and, therefore, that the Calbecks' subsequent resistance to the arresting officers was not improper. The controversy went back to the Second District Court of Appeal in City of St. Petersburg v. Calbeck, Fla.App., 121 So. 2d 814 (1960). That Court again quashed the judgment of the Circuit Court. The Court held that the arrests were valid and that there was sufficient evidence to sustain the conviction before the municipal court. In deciding the question of the validity of the arrest, the Second District Court of Appeal found that words appearing in the testimony fell within the category of "abusive or profane language" contained within the ordinance and it again set out the examples of breach of the peace or disorderly conduct that it had previously accepted.

As recently as 1965, in Headley v. Selkowitz, 171 So.2d 368, 12 A.L.R.3d 1443, the Supreme Court of Florida, in declaring invalid a "vagrancy" section of the Miami City Code, specifically announced that it receded from State ex rel. Green v. Capehart to the extent only that that case conflicted with the opinion in *Headley.*

The Supreme Court of Florida, in *Headley*, held that ancient "vagrancy" verbiage in the Miami City Code was vague and overbroad, and added that the language did not measure up to the *standards* referred to in the City of St. Petersburg v. Calbeck, 114 So.2d 316 (2 Dist.Fla.App.1959).

So we see that the language in subsection (a), upon which has been grafted the standards set forth in City of St. Petersburg v. Calbeck, remains acceptable to the Supreme Court of Florida.

We now turn for our directives to the treatment that the Supreme Court of the United States and other federal courts have afforded language identical to and comparable with the language of subsection (a).

The question before the Court could be disposed of by citing Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1948). There the Supreme Court of the United States held that a Chicago ordinance, as construed in the charge to the jury by the Illinois trial court, was unconstitutional as applied to the conduct of Terminiello. Terminiello's conviction was affirmed by the Supreme Court of Illinois. The city ordinance considered by the Supreme Court of the United States in *Terminiello* included language *identical* to our subsection (a). Illinois courts had construed the provisions of the Chicago ordinance as follows: "[A] 'breach of the peace' consists of any 'misbehavior which violates the public peace and decorum'." The Illinois courts had added that "misbehavior may constitute a breach of the peace if it stirs the public·

3. The Florida Circuit Court has appellate jurisdiction over the municipal courts located within the circuit.

to anger, invites dispute, brings about a condition of unrest or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm."

The Florida courts' construction and the Illinois courts' construction make similar impacts upon the identical ordinance provisions. However, the Florida courts' construction suffers from the further impediment visited upon it by the Supreme Court of the United States in Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) and Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966). In those cases exact language included within the constructions placed upon subsection (a) by the Florida courts was weighed by United States constitutional standards and found wanting.

In *Edwards*, petitioners had been convicted of the "common law crime of breach of the peace." The Supreme Court of South Carolina had said that such offense was "not susceptible of exact definition." but that a general definition of the offense was as follows: "[a] breach of the peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence * * *, it includes any violation of any law enacted to preserve peace and good order." That is Florida's language. The Supreme Court of the United States, in an opinion written by Justice Stewart, expressing the view of eight members of the Court, held that the conviction in South Carolina infringed constitutionally protected rights of free speech. It said that the "common law crime of breach of the peace," as construed and defined by the Supreme Court of South Carolina, was so vague and indefinite as to be repugnant to the guarantee of liberty contained in the Fourteenth Amendment to the Constitution of the United States.

*Ashton* resulted from a conviction under the "common law offense of criminal libel" and an affirmance of that conviction by the State of Kentucky's highest court. On certiorari, the Supreme Court

of the United States reversed. An opinion by Justice Douglas, expressing the view of eight members of the court, and concurred in by Justice Harlan, held that the elements of libel as defined by the Courts in Kentucky was so indefinite and uncertain that it would not be enforced as a penal offense. The trial court in Kentucky had charged the jury that "criminal libel is defined as any writing calculated to create a disturbance of the peace, corrupt the public morals, or lead to any act, which, when done, is indictable." That is Florida's language. Kentucky's highest court, in affirming the judgment of conviction, adopted a different and more restrictive definition after having ruled that the element of breach of the peace was no longer a constitutional basis for imposing criminal libel. The Supreme Court of the United States said that the constitutional defect of the conviction was not curable by the limited construction given the offense by Kentucky's highest court.

The Illinois trial court's interpretation of the Chicago ordinance did not measure up to the United States constitutional standards. Neither does Florida's interpretation of subsection (a) measure up to United States constitutional standards. Therefore, Terminiello is controlling here.

The defendants, in their brief and in oral argument before this Court, rely heavily upon Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). The City of Chicago did the same in *Terminiello*. *Chaplinsky* was cited by the City of Chicago for the general proposition, urged by the defendants in the case before us, that the constitutional guarantee of free speech does not prevent the punishment for slanderous, abusive and offensive utterances which have a tendency to breach the peace. The oral argument in *Chaplinsky* focused on the issue of whether or not the content of the offender's speech was composed of derisive, fighting words which carried it outside the scope of the constitutional guarantee. The Supreme Court of the United States

did not reach that question. It detected a preliminary question that was dispositive of the case—the constitutionality of the ordinance as construed and applied.

The Chicago ordinance which included language identical to our subsection (a) was still on the books when Judge Will effected its demise in Landry v. Daley,[4] supra.

Judge Will hung the crepe on the door, but it was for Justices Black, Douglas, and Harlan to provide the post-mortem in the case of Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). In a concurring opinion written by Justice Black, joined by Justice Douglas, the ordinance was labeled a "meat axe ordinance" and Justice Harlan, in a concurring opinion, decisively stated that the ambulatory scope of the ordinance ran afoul of well established constitutional principle.

 Therefore, it necessarily follows that subsection (a) of the subject Miami ordinance must go the way of the identical provision in the Chicago ordinance, for the identical reasons that called for the replacement of the Chicago ordinance.

In several of the cases cited above, the courts have given special attention to certain of the words and phrases in subsection (a), but we find no criticism of the language which makes it a violation to cause a riot. Indeed, it appears clear that the City of Miami may enact an ordinance which makes it an offense to knowingly and wilfully cause a riot. The entire section, when read in context, must be stricken because that was the treatment afforded it by the Supreme Court of the United States. Further, the state anti-riot statute, Chapter 870, Fla.Stat. (1967), F.S.A., has been adopted by the City of Miami, Miami City Code § 38–50 (1967). Therefore, the police power of the city will not be affected by the court's removing the "riot" provision

from the subject "disorderly conduct" ordinance. The adopted state statute does not suffer from the vice of attempting to make one a violator who "countenances" a riot.

Therefore, plaintiffs' motion for summary judgment is granted as to subsection (a) of § 38–10 of the Miami City Code. That subsection is unconstitutional. An injunction will issue restraining the enforcement of subsection (a) of § 38–10 of the Code.

---

4. The City of Chicago enacted a new ordinance on the subject following Judge Will's opinion in *Landry*. Chapter 193–1, Municipal Code of the City of Chicago, entitled "Public Peace and Welfare."